### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

In re

**CANYON HOLDINGS, LLC SERIES 39,**

Debtors.

Case No. **11-60814-11**

## *MEMORANDUM OF DECISION*

At Butte in said District this 23rd day of August, 2011.

In the above-captioned Chapter 11 case, after due notice, the Court held a hearing at Missoula on July 27, 2011, on the Motion to Modify Stay (Docket No. 11) by Intervest-Mortgage Investment Company ("Intervest") pursuant to 11 U.S.C. §§ 362(d)(1) and (d)(2), and Debtor Canyon Holdings, LLC, Series 39's ("Debtor" or "Series 39") objection thereto. Intervest was represented by attorney Benjamin P. Hursh ("Hursh") of Crowley Fleck PLLP, Missoula. Debtor was represented by Steven M. Johnson ("Johnson") of Church, Harris, Johnson & Williams, P.C., Great Falls. Testimony of witnesses was heard and exhibits were admitted. At the conclusion of the parties' cases-in-chief the Court took Intervest's Motion under advisement. After review of the Motion and the record, and applicable law, this matter is ready for decision. For the reasons set forth below a separate Order will be entered denying Intervest's Motion to Modify Stay.

This Court has jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a). Intervest's Motion to Modify Stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G). It seeks relief from

1

the stay under § 362(d)(1) for "cause" alleging that the Debtor filed the case in bad faith, and under § 362(d)(2) alleging the Debtor lacks an equity in Intervest's Collateral[1] because the Debtor did not own the collateral prior to the date Series 39 filed its Chapter 11 petition, because the debt secured by the Collateral exceeds the value of the Collateral, and that the Collateral cannot be necessary to an effective reorganization because the Debtor did not own it prior to April 29, 2011. This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

At the hearing expert appraisers[2] Nicholas Joseph Hogan ("Hogan") and Tom Stevens ("Stevens") testified.  Debtors also called to testify Sterling Bank[3] construction loan workout specialist Ronald William Fuller ("Fuller").   Debtors' Exhibits ("Ex.") A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, rebuttal Ex. X, and Intervest's Ex. 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 all were admitted were admitted into evidence by stipulation of counsel.  In addition the Court granted Debtor's motion to take judicial notice of proceedings, pleadings and transcript of

---

[1]The Motion describes Intervest's security as:

Units 101 through 111, 201 through 211, 301, 401 through 405 and 407 through 411 of Mullan Heights Condominiums, Condo000169, as defined in the Declaration of Unit Ownership for Mullan Heights Condominium Homeowners Association, Inc. recorded on March 11, 2008 in Book 814 of Micro Records at Page 771.

Together with an interest in the general and limited common elements as defined in the Declaration of Unit Ownership for Mullan Heights Condominium Homeowners Association, Inc. Referenced above.

The specific above-described collateral, which is located in Missoula County, Montana, will be described for purposes of brevity herein as the "Collateral," while the entire project will be referred to as the "Mullan Heights Condos."

[2]The parties stipulated as to the foundation of their appraisers.

[3]Sterling Bank is Intervest's parent company.  Transcript ("Tr.")., p. 95.

2

September 4, 2009, from Case No. 09-2-02301-4 in the Superior Court of the State of Washington

for Whatcom County (Dkt. 66; Ex. W), Debtor's Chapter 11 Plan, Disclosure Statement and

exhibits thereto, and Debtor's June monthly operating report ("MOR") (Dkt. 61).

## FACTS & PROCEDURAL HISTORY

Canyon Holdings, L.L.C. ("Canyon Holdings") is a corporation formed under the laws of

the State of Delaware as of June 4, 2003.  Ex. J.  Derek Stebner ("Stebner") is named as the

manager of Canyon Holdings on the LLC operating agreement.  Ex. J.

Ex. K is a list of 41 "Series" and members of Canyon Holdings, with 100% interest in

Series 39, and the "Common Name" of Series 39 is listed as "Mullan Heights – Missoula, MT

(prospective bulk value finished units).  Ex. K includes several "Separate Series Agreements"

with the newly created series, including one for "Series 39" effective September 7, 2005.  Ex. K

(Ex. B.39 attached thereto).  The "New Series" identified in Ex. B.39 to Ex. K is "Series 39."

Stebner is identified as the manager and member of 100% of Series 39.  Ex. K/B.39.

Ex. L is a warranty deed of certain real property in Blocks 14 and 15 of Mccormick's

Addition No. 2, a platted subdivision in the City of Missoula, Montana, which was granted to

Stebner dated 3/30/2005.  That real property later was developed into the Mullan Heights Condos

on the riverfront of the Clark Fork River in Missoula.  Ex. M is a quitclaim deed of the same real

property, with Stebner conveying the property to Series 39, dated March 27, 2007.  Ex. N is a

warranty deed of the property from Series 39 to Canyon Holdings, dated September 6, 2007.

On August[4] 6, 2007, Stebner, as manager of Canyon Holdings, signed a "Limited Liability

---

[4]At the hearing Hursh stated the dates of Ex. 1, 2, and 3 as April.  The exhibits plainly
state the month as August.  Dkt. 64.

Company Authorization to Borrow and Hypothecate" the principal sum of $7,172,000 from Intervest. Ex. 1 is the Authorization, and it provides at paragraph 6 that the authority conferred therein shall be deemed retroactive.

Ex. 2 is a trust indenture note for the principal balance of $7,172,000.00 loaned to Canyon Holdings, dated August 6, 2007, with the entire balance of principal and interest due to be paid in full to Intervest by March 1, 2010. However, on page 1, paragraph b of Ex. 2, the maturity date may be extended to September 1, 2010, upon giving the lender notice in writing and paying the lender 0.25 percent (0.25)% of the then outstanding principal balance at least 30 days prior to the maturity date. Another extension of the maturity date to March 1, 2011, is provided upon giving notice in writing and payment of another 0.25% of the then outstanding principal. At page 3, the second paragraph of Ex. 2 states that the "real property is being developed as a condominium project." Tr., p. 105.

Ex. 3 is a "Trust Indenture, Assignment of Rents and Security Agreement (and Fixture Filing)" dated August 6, 2007, securing the $7,172,000 note at Ex. 2 with the Collateral and other security. Among other things, Ex. 3 at pages 12 and 13 contemplates that rental agreements and leases may be applied to the Collateral under certain conditions.

Fuller testified that the loan originated as a construction loan for a condominium project, and that it was not built as an apartment complex. Tr., p. 96. Stevens testified that the Mullan Heights Condo project was originally designed, conceived, and constructed as a 44-unit multistory residential condominium on riverfront property, for individual ownership. Tr., p. 89. Hogan admitted on cross examination that the Mullan Heights Condos is a declared condominium, with a condominium declaration filed with the Missoula Clerk and Recorder real estate records. Tr., p.

4

21.  Hogan testified that the Collateral includes condos constructed in five different sizes.  Stevens testified that the Mullan Heights Condo has amenities such as sound-deadening in the walls, wide hallways, river views, and underground parking, that would not be put in an apartment building because you would not get an economic return for them.  Tr., pp. 89-90.

One unit sold in September 2008, and there are 43 units remaining. Hogan testified that Canyon Holdings submitted offers of sale of some condos, but that Intervest refused to grant partial releases of its deed of trust for any of the offers.  Tr., p. 59.  Stevens testified that the current sales broker of the Collateral units has lost sales to other condo developers because they could not be guaranteed possession.  Tr., p. 82.  Fuller testified that there were 3 offers made to purchase Collateral units, but that Intervest rejected the offers because the offers did not rise to the release prices established in Ex. 2 in August of 2007.  Tr., pp. 105-106.  Ex. F, G, H, and I are buy sell agreements for Units 210, 302 and 405 dated from July 2010 to October 2010.

Hogan testified that the condominiums are all rented, and Fuller testified that the units have been rented since 2009.  Tr., p. 99.  Based on the leases Intervest declared a default, accelerated all amounts due under Ex. 2, and commenced litigation against Stebner and another entity, Plantation Holdings of Whatcom, LLC, a Delaware limited liability company, in Whatcom County, Washington Superior Court, No. 09-2-02301 in August of 2009, prior to maturity of the note.  Tr., p. 100.  Fuller testified that Intervest accelerated the note and commenced the Washington litigation because of a change in use and venue of the collateral, specifically that some of the units had been rented versus being sold.  Tr., p. 101.  Fuller testified that there had been no monetary default by Canyon Holdings at the time it commenced the litigation, but there had been covenant default.  Tr., pp. 101-02.  Intervest obtained a temporary restraining order

5

("TRO") and requested prejudgment attachment.  Ex. T.

Fuller testified that the state court in the Washington litigation rejected Intervest's acceleration based upon Intervest's theory of changing use.  Tr., p. 103.  The court held that there was no default, and that Canyon Holdings was allowed to collect rents.  Tr., p. 103.  Ex. W is the transcript of the Washington court proceeding on September 4, 2009.  On the issue of whether Stebner was entitled to rent out the Mullan Heights Condos the court wrote:

> Quite frankly I suspect that it's true with the market the way it is and property sales tanking that in order to permit this to continue going until the market turns around it was foolish for them not to rent them out because otherwise they would have put them into a sure default.

Ex. W, p. 14.

The court proceeded to lift the TRO and denied Intervest's motion for a preliminary injunction and prejudgment attachment.  Ex. W, pp. 28, 29.  The court's reasoning is worth quoting here:

> I find there was not a breach of the agreement between the debtor and the mortgage company.  The mortgage company, through the assignment of leases, contemplated clearly in my mind that there would be leases and they would be allowed so long as it didn't encumber the property.
>
> In this case the leases do not encumber the property because they give 20 days notice.  They're attempting to sell every one of these units which was originally contemplated.  They were permitted by the agreement to receive no more than one month's rent in advance and to apply it in accordance to the contract.  There's no indication that they've done anything out of the ordinary here.  And I find that there is no default.
>
> If there is a default because they didn't first obtain the permission, their obligation to obtain permission is not clearly laid out in this agreement in the court's mind because that assignment to me says we contemplated there's going to be leases.  So, if it does constitute a breach, it is deminimus.  And the action of the mortgage company should have been simply to first to say listen, we understand these units are rented or leased, you have to first obtain our

6

permission, and you can argue about that later, if they had simply sent a letter back saying we are seeking permission.  Under the circumstances of this case it would have been unreasonable for the institution to withhold consent unless there's damage being done to the property and diminishing the value and the debtor is doing nothing to prevent that from happening.

Ex. W, pp. 26-27.

On October 8, 2010, Canyon Holdings' counsel met with Fuller and a vice president of Sterling Bank and informed them of the possibility that a Chapter 11 case could be filed before any foreclosure could be completed.  Tr., pp. 97, 114.  Intervest filed a notice of nonjudicial foreclosure of the Collateral in December of 2010.  Tr., p. 103.  Ex. 4 is a "Notice of Trustee's Sale dated December 7, 2010, setting a nonjudicial foreclosure sale of the Collateral by public sale to be held on April 29, 2011.  At page 3, Ex. 4 states the principal due in the amount of $6,360,786.44 as of November 24, 2010, interest accrued as $514,708.61 which accrues at $1,089.82 per day, and late fees of $22,038.44.

In December of 2009 or January of 2010, Canyon Holdings paid Intervest approximately $291,770 in prepayment of principal after Canyon Holdings sold some of the excess land Collateral to a funeral home.  Tr., p. 107.  That payment was more than the 30 days prior to the March 1, 2010, maturity date of the note, Ex. 2.  Johnson asked Fuller whether the $291,770 that Canyon Holdings paid Intervest equaled approximately 5% of the outstanding principal balance, and Fuller testified that he assumed Johnson's math was correct.  Tr., p. 108.  Fuller also answered "yes" when asked whether, upon payment of the .25 %, the maturity date is extended to March 1, 2011 under paragraph b of Ex. 2.  Tr., p. 109.  However, Fuller testified that he never received the notice in writing required under Ex. 2 requesting the extension, and that the monetary payment alone did not extend the loan.  Tr., p. 110.

7

On April 19, 2011, the property manager sent the tenants of the Mullan Heights Condos a letter, Ex. 5, offering them a 30 percent (30%) discount if they paid the May 2011 rent by April 28, 2011.

Ex. 7 is a quitclaim deed signed by Stebner for Canyon Holdings, dated April 28, 2011, which quitclaimed the interests of Canyon Holdings in the Mullan Heights Condos to Series 39. The recording information on the top of page 1 of Ex. 7 states that it was recorded in the office of the Missoula County Clerk and Recorder on April 29, 2011.

Series 39 filed its voluntary Chapter 11 petition (Ex. 6) on April 28, 2011, with Schedules and a Statement of Financial Affairs ("SOFA"), and the 2009 "U.S. Return of Partnership Income" for Canyon Holdings.  Ex. 6. The petition was signed by Stebner as manager of the Debtor.

At Schedule A the Debtor lists 43 units of the Mullan Heights Condominiums at a total current value in the amount of $8,703,621.00, securing claims totaling $6,893,597.66.  Schedule B lists two types of personal property – past due rents in an unknown amount, and claims in a state court lawsuit against Evans & Vertin for breach of contract in an unknown amount. Schedule D lists Intervest as a disputed secured claim secured by the condos in the amount of $6,792,799.52, and lists property taxes owed to the Missoula County Treasurer in the sum of $100,798.14.

Intervest filed its Motion to Modify Stay on May 5, 2011.  The Motion states the full amount of the principal as due, plus accrued interest and late fees for a total debt in the amount of $7,272,560.67.  Debtor filed its objection on May 19, 2011, and filed a brief (Dkt. 69) on July 22, 2011.  Intervest filed memorandum of law on July 26, 2011 (Dkt. 75).

8

On July 22, 2011, Debtor filed its Chapter 11 Plan of Reorganization ("Plan") (Dkt. 67) and Disclosure Statement (Dkt. 68). The Plan generally provides for the sale of the 43 remaining Mullan Heights condo units over a two year period.

Ex. 8 is the Debtor's MOR for May 2011. Ex. 9 is a property tax printout from Missoula County. It shows unpaid real property taxes for the years 2009 and 2010 in the total amount of $151,204.65, penalty totaling $3,024.42 and interest in the amount of $8,139.28 as of June 15, 2011, the total of which is $162,368.35. Ex. 9.

Hogan and Stevens physically inspected the Collateral together on the same day.

**Hogan Appraisal Testimony.**

Nick Hogan is an MAI-designated appraiser for Hall-Widdoss & Company, P.C. ("Hall-Widdoss"). Hogan was hired by Intervest through its counsel to prepare an appraisal of the Mullan Heights Collateral in "as is" condition, both as an apartment complex and as a "sellout" or bulk sale to a single buyer or developer as a condominium project, using a discounted cash flow analysis. Tr., p. 12. Hogan's appraisal was admitted as Ex. 10, dated June 30, 2011. Hogan testified that he utilized all three valuation approaches in valuing the Collateral as an apartment complex, i.e. the cost approach, income approach and the sales comparison approach. He gave his opinion that the value of the Collateral is $4,400,000 as an apartment complex, and $4,200,000 as a condominium sellout.

Hogan testified that he appraised the Collateral as an apartment complex because that was a condition of his assignment and instructions of his client. Tr., p. 28. He testified that the condominiums are nearly full. He admitted that at least one of the Mullan Heights condos has been sold, but testified that his appraisal value as an apartment house assumed the sale of the

9

entire project as an apartment house.  Tr., p. 44.  When asked about the recorded declaration of

condominiums on record for the Collateral, Hogan simply made the assumption that they are

invalid.  Tr., p. 45.  On redirect examination, Hogan testified that the project was full and is being

utilized as an apartment complex[5].  Tr., pp 62, 63.

Stevens testified that he disagrees with Hogan's valuation of the Collateral as an apartment

complex.  Tr., p. 83.  Stevens testified that valuing it as an apartment house does not give

consideration to the declaration of condominium and bylaws which allows units to be sold

individually, and that the developer did not build an apartment complex, he built a 44-unit

residential condo.  Tr., pp. 83-84.  Stevens further explained that the economic value is not in an

apartment complex, it is in selling the 43 individual units.  Tr., p. 85.

Stevens testified that he understood why the units are being rented – "to establish cash

flow, to establish a bank account to make repairs, to establish – have enough money to pay

maintenance on the building."  Tr., p. 86.  He testified that it is not unusual in economic hard

times for a condominium to be rented, and that many are rented around Missoula if they are not

selling.  Tr., p. 86.

Ex. 10 includes a section entitled "Highest and Best Use" and defines it as:

> The reasonably probable and legal use of vacant land or an improved property,
> which is physically possible, appropriately supported, financially feasible, and
> that results in the highest value.  The four criteria the highest and best use must
> meet are legal permissibility, physical possibility, financial feasibility, and
> maximum profitability.

Ex. 10, p. 31.

---

[5]On re-cross examination Hogan testified that he believes that the tenants renting the
condos would have 20 days under the leases before the leases terminate upon sale of the condos.
Tr., p. 68.

Hogan's appraisal does not state a conclusion of what is the highest and best use of the Collateral.  At page 33 of Ex. 10 he states:  "The proposed improvements represent a large multifamily residential project (originally developed and have legal definition as condominiums) that is a legal use under zoning."  Hogan did not explain how the 43 completed condos, which are the subject of a recorded declaration of condominium, have been on the market and have received offers to purchase are "proposed improvements."

Stevens testified that he did not think an investor would buy the Collateral as an apartment complex because of the necessary expenses and common area maintenance, and the higher taxation as a condominium which would require the buyer to undertake proceedings to vacate the declaration of condominium, an idea which Stevens found "absurd."  Tr., p. 86.

On cross examination Hogan admitted that it was not part of the conditions of his employment by Intervest to value the remaining 43 units separately, which is "a normal valuation technique."  Tr., p. 29.  Hogan admitted that if Debtor's Plan were confirmed permitting the sales of condos, then it would be appropriate to value the units as condominiums using the comparable sales approach and other sales of condos in Missoula.  Tr., p. 59.

 Hogan testified that he considered some items such as interior loading hallways "superadequate items" among the "functional obsolescence" in the Collateral, but he clarified that the items were superadequate for an apartment complex, and he did not consider the hallways as superadequate for condominium units for sale to the public.

Hogan testified that in valuing the Collateral as a condominium sellout he relied most heavily on the discounted cash flow analysis, which he testified was the same methodology used by Stevens.  Hogan did not calculate the value of each of the 43 units, but instead discounted the

cash flow of an average sales price of all the units based on square footage, and then averaged sales prices over time.  Tr., p. 27.

Hogan considered five comparable sales, only one of which is a completed sale of an apartment complex in Missoula, in calculating the value under the sales comparison approach. Tr., p. 46.  Three of the comparable sales were in Spokane, Washington, and one comparable was just a listing.  Hogan used a discount rate of 12.5, which he described as "sort of a mid-to-low range of discount rates."

Hogan explained the difference between his valuation and Stevens' valuation is the absorption rate, which is the length of time it takes to sell out the condominium project to the last unit.  Hogan used an absorption rate of 6 to 9 units sold per year, based upon four comparable projects in Missoula[6] which he testified he considered, and he testified that Stevens used an absorption rate of 21.5 sales per year.

Hogan testified that he looked at other condo projects in Missoula to get a feel for the entire market.  Discussing the market in general, Hogan testified that the residential real estate market is weak, and he included at page 69 of Ex. 10 a discussion of weak demand of single-family lots.  Tr., p. 53.  Under cross examination Hogan admitted that he has no data on the market for finished condominiums, and that he relied on a sale of vacant land to predict the value of a finished condominium project.  Tr., pp. 53, 57.  At page 55 Hogan testified that he does not know that the general market is going to turn around, but "I don't have any support for the other side either."  Tr., p. 55.

_____

[6]Hogan identified the four projects in Missoula as 4100 Mullan Road (the "4100"), 2101 Dearborn, 801 North Orange and 1010 West Pine.  Tr., p. 15.

Hogan testified that the "4100" condominium project on Mullan Road is a new project which compares well to the Collateral.  He testified that the 4100, which Stevens also considered in determining his absorption rate, has the highest rate of sales and is the best-performing condominium project in Missoula.  Hogan testified that he considered the 4100 project from the time they started selling condos to when they sold the last unit, which included 200 days while the 4100 was still under construction.  Including that 200 days, Hogan calculated an absorption rate of 1.2 units per month which worked out to 14.4 units per year.

Under cross examination Hogan admitted a number of errors in Ex. 10.[7]  He also testified that both of his values as bulk sale of the condos and as an apartment house would be a sale of the entire 43 units.  Hogan admitted that, because of the recorded declaration of condos, the Collateral is being taxed at the higher level of taxation for condos.  Hogan admitted under cross examination that the amount of $36,550 which he listed on page 46 of Ex. 10 as the approximate real property taxes is not the current taxes as a condo project.  Tr., p. 43.  Stevens testified that his research at the county treasurer's office showed per-unit property taxes approximately twice what Hogan indicated[8].  Tr., p. 84.

---

[7]Hogan admitted making typos or mistakes on Ex. 10 at pages 4, 6, 42, 50, 59, 60, 70, 81, 84.  Tr., pp. 23, 30, 31, 32, 51, 53, 54.  Many of the typos were using the plural "our" and "we" instead of "my," "I" or "me."  Hogan testified that he copied excerpts from other reports and pasted them into Ex. 10, and that his report "got corrupted." Tr., p. 51.  He also admitted that he should have included the legal description from the recorded declaration of condominium in his report.  Tr., p. 33.  Hogan denied that his mistakes in Ex. 10 reflect failure to meet the standards of his USPAP ("Uniform Standards of Professional Appraisal Practices") certification.

[8]Stevens explained that in order to reduce the tax burden to what Hogan indicated, the entire condominium would have to be vacated and the developer would have to appear before the County Tax Board, presumably to have the status of the property changed to an apartment complex.  Tr., p. 85

13

Hogan testified that he included on page 86 of Ex. 10 a total retail value of $8,577,601 which represents "the total aggregate of the sales of all 43 individual units." Tr., p. 28.

**Stevens' Appraisal Testimony.**

Stevens is an MAI-designated appraiser, and retains a SRA designation for residential appraisal. He has been an appraiser in Missoula since 1978. Stevens was hired to appraise the 43 remaining units of the Mullan Heights Collateral. Stevens' appraisal was admitted as Ex. A. Stevens' conclusion is that the 43 units have a total value, as of June 29, 2011, in the amount of $8,182,125 by gross retail sales, and that the value indication of a bulk sale to a single purchaser is $6,070,000.

Stevens testified that he relied on the sales comparison approach in arriving at his valuations, and that the highest and best use of the Collateral is for sale of the 43 units as condominium units. Tr., p. 86-87. Stevens explained that the $8,182,125 estimate would be appropriate if all 43 condos sold today, which will not happen. Therefore, he testified that the appraiser must estimate a time sellout and absorption rate, deduct expenses, and the process the net income by a discounted cash flow into an indication, which is what the $6,070,000 indicates. Tr., pp. 74-75. Hogan testified that Stevens used a discount rate of 10%. Ex. A uses two discount factors of .9431 and .90118.

When asked on direct examination whether a bulk purchaser for the Collateral is likely to appear in Missoula Stevens testified that he did not think that was realistic. He testified that to achieve the greatest net return to everyone involved, each of the 43 individual units should be sold to end users, who may be owner occupants, or investors who buy 1 or 2 units. Tr., p. 75. Stevens testified and estimated that an absorption rate/exposure period of 20 to 21 sales per year for the 43

14

Collateral units can be achieved based on the competitive price range in which the 43 units fall. Ex. A[9]. Hogan testified that Stevens' 2-year absorption rate or 21.5 units per year for the Collateral is "very optimistic" when compared to the performance of the 4100.

Stevens testified that he did not look just at the "4100." Stevens researched sales of condominium units in the Missoula Multiple Listing Service. Tr., pp. 77-78. From January 1, 2009, through July 18, 2011, Stevens testified, 109 residential units sold in the greater Missoula area in the price range from $130,000 to $300,000. Tr., p. 77. Stevens testified that price level "surprised me, 109 units in the heat of the recession." Tr., p. 77. Stevens testified that, in his opinion, the 43 Collateral units would have competed for the same sales[10] if they had been priced accordingly. Tr., p. 77.

For the shorter period starting January 1, 2011, through July 18, 2011, Stevens stated there have been 25 sales of condos in Missoula at the same price range anticipated for the 43 Collateral units. Stevens concluded that if the Collateral units are priced appropriately and marketed aggressively, and the impediments to sale are removed, they should be able to achieve a sellout in 2 years, which is his absorption rate of 21.5 units per year. Tr., pp. 89-80, 82. Under cross examination, Stevens was asked about additional inventory which will come on the market as the 4100 completes building another phase. Stevens answered that the additional phase of the 4100 is 8 units, that he did not think 8 units will have a material impact on his projections, and he knew of

---

[9]Stevens' appraisal Ex. A is not paginated. He read from the page that says "absorption rate/exposure period" which he said was 3/4 of the way through Ex. A (21.5 units per year). Tr., pp. 76-77 (20 to 21 units per year).

[10]Stevens testified that the developer of the 4100 "was delighted" that Intervest was refusing offers to purchase the Collateral because they came from Mullan Heights to him and bought units. Tr., p. 81.

no other condo projects planned.  Tr., p. 92.

## DISCUSSION

Intervest's Motion to Modify stay is based upon § 362(d)(1) and (d)(2).  Section 362(d)(1) allows for the granting of relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest[.]"   This Court explained the standard for modifying the stay for "cause" under § 362(d)(1) in *In re Westco Energy, Inc.*, 18 Mont. B.R. 199, 211-12 (Bankr. D. Mont. 2000):

> Section 362(d), however, provides that, "[on request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay" in three instances.  The subsection relevant to these proceedings is § 362(d)(1), which allows for the granting of relief from the automatic stay "for cause".[11]  What constitutes cause for purposes of § 362(d) "has no clear definition and is determined on a case-by-case basis." *Tucson Estates*, 912 F.2d at 1166.  *See also Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In the Matter of Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (Relief from the automatic stay may "be granted 'for cause,' a term not defined in the statute so as to afford flexibility to the bankruptcy courts.").

Section 362 vests this Court with wide latitude in granting appropriate relief from the automatic stay, and a decision to lift the automatic stay is within a bankruptcy court's discretion, and subject to review for an abuse of discretion.  *In re Delaney-Morin*, 304 B.R. 365, 369-70 (9th Cir. BAP 2003); *In re Leisure Corp.*, 234 B.R. 916, 920 (9th Cir. BAP 1999); *In re Plummer*, 20 Mont. B.R. 468, 477-78 (Bankr. D. Mont. 2003); *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d

---

[11]  Section 362(d)(1) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section , such as by terminating, annulling, modifying, or conditioning such stay–

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]

107, 108-109 (9th Cir. 1995).

Section 362(d)(2) provides for the granting of relief from the stay if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."  The burden of proof under subsection (d) on the issue of the debtor's equity in property is on the moving party, Intervest, and the party opposing such relief has the burden of proof under all other issues.  11 U.S.C. § 362(g).  Therefore Intervest has the burden of proof on the issue of the Debtors' equity.

### § 362(d)(2).

The case presents the Court with several different proposed values for the Collateral. Hogan's Ex. 10 appraisal states the value of the Collateral as an apartment complex in the amount of $4,400,000.00, and as a sellout to a traditional condominium development in the amount of $4,200,000.  Stevens' Ex. A states the value as $8,182,125 gross retail sales, and in the amount of $6,070,000 if sold to a bulk purchaser.  Each of the value opinions reflects problems with assumptions, together with the problems and uncertainty in today's gloomy market conditions. The Court finds and concludes that Stevens' value of $8,182,125 suffers from the fewest problems, and therefore the Court finds that the value of the Collateral is $8,182,125 for the following reasons.

The Court disregards Hogan's $4,400,000.00 opinion of the value of the Collateral as an apartment complex.  Simply put, it is not an apartment complex it is a condominium.  Hogan testified that he was charged employed in part to value the Collateral as an apartment complex, as well as a sellout as a condominium to a single purchaser, but that unreasonably restricts the purpose for which the Court uses an appraisal, i.e., to determine whether Intervest has satisfied its

17

burden to show that the Debtor does not have an equity in the Collateral.

The evidence is uncontroverted that the Mullan Heights Condo was conceived, designed, financed, built, and operated as a condominium, not as an apartment complex. It has a declaration of condominium recorded in Missoula County, and is taxed at a higher rate for a condominium. Intervest suggests that the Collateral can be turned back into an apartment complex, but offered no credible evidence to explain how that can take place given the evidence that one of the units has been sold as a condominium. Hogan's section of "Highest and Best Use" recognizes that the Collateral was "originally developed and have legal definition as condominiums" and he did not state that the Highest and Best Use of the Collateral is as an apartment complex.

Both Hogan and Stevens testified that the existence of a single purchaser of the Collateral is unlikely, either as an apartment complex or as a condo sellout, in the Missoula market. The restrictions of Hogan's employment prevented him from considering anything other than a single purchaser, which removed from Hogan's appraisal what Stevens testified was the real economic value of the Collateral -- sales of condos to individual owners or small investors of one or two units.

The only reason given for the valuation of the Collateral as an apartment complex was that Canyon Holdings leased all the remaining units to renters. As Stevens testified, and as the Washington Superior Court noted, it was not unusual for the developer to lease the units in order to create cash flow to pay expenses while the units are being sold. The Washington court found that leasing the units was provided under the assignment of rents, Ex. 3, that renting them out was not a breach and if it was a breach it was de minimis, and that given the market it would be "foolish" not to rent the units out. Ex. W, pp. 14, 26-27. The Court sees no justification for

18

considering the value of the Collateral as an apartment complex, which ignores the legal reality that it is a condominium, and therefore the Court disregards Hogan's $4.4 million value opinion as an apartment.

The Court also disregards Hogan's $4.2 million opinion of the Collateral as a sellout of condos to a single purchaser. The testimony established that it is not likely for a single purchaser to be found to pay $4.2 million. For the same reason the Court disregards Stevens' $6,070,000 value indication to a bulk purchaser. He testified that the existence of a bulk purchaser of 43 units is unlikely.

What remains is Stevens' $8,182,125 value opinion for gross retail sales. Stevens testified that the real economic value of the Collateral was in selling to individual buyers or small investors. The two appraisers differed on the absorption rate they used. Stevens used an absorption rate of 21.5 units per year for the 43 units, while Hogan testified that only from 6 to 9 units could be expected to sell per year. The Court finds that Stevens is entitled to more weight because Stevens performed more specific research on condominium sales.

Hogan admitted that he based his opinion on the market in part on land sales. Stevens researched the Missoula Multiple Listing Service and discovered that during the "heat of the recession" 109 residential units sold in the Missoula area in the price range from $130,000 to $300,000 in which the Collateral is for sale. Tr., pp. 77-78. Hogan's opinion was not based upon condo sales, and therefore the Court finds that the absorption rate is as Stevens testified, and that the 43 units can be sold in two years. Tr., p. 80. With respect to the value of the Collateral, the Court finds and concludes that it has a value as stated in Ex. A in the amount of $8,182,125.

Intervest's principal was stated at the hearing, by stipulation, in the amount of

19

$6,360,786.44.  Tr., p. 69.  Hursh explained that the parties dispute the way Intervest calculates

interest and so did not stipulate those amounts.  Intervest has the burden of proof on equity under

§ 362(d)(2), and so any lack of evidence as to the amount of interest weighs against Intervest.

Ex. 4 states the principal due in the amount of $6,360,786.44 as of November 24, 2010,

interest accrued as $514,708.61 which accrues at $1,089.82 per day, and late fees of $22,038.44.

However, the testimony convinces this Court that Intervest has not satisfied its burden of proof

that it is entitled to interest in any specific amount which would allow this Court to include

interest in its determination of Debtor's equity.

Fuller admitted that Canyon Holdings paid Intervest approximately 5% of the outstanding

principal balance pursuant to paragraph b of the note, Ex. 2, which would have the effect of

extending the maturity date of the note to March 1, 2011.  Despite receipt of payment of ten times

the amount, Fuller testified that the note was not extended because Intervest did not receive notice

in writing.  This Court's reaction is akin to the Washington Superior Court's reaction to

Intervest's declaration of a default, at page 27 of Ex. W.  Under the circumstances it would appear

unreasonable for Intervest to refuse to extend the maturity date based on the de minimis lack of

notice in writing, if true.

The effect on the amount of interest is thus unknown and the amount of interest to which

Intervest is entitled is unproven, which weighs against Intervest as the party with the burden of

proof.  Resolution of Intervest's claim, including interest, is beyond the scope of this proceeding.

A hearing on a motion to modify stay is a summary proceeding in which a court should seek only

to determine whether the party seeking relief has a colorable claim to property of the estate, and

the expedited nature of the hearing "limits the court's ability to make a full adjudication of the

merits of the parties' claims." *In re Luz Intern., Ltd.*, 219 B.R. 837, 842 (9th Cir. BAP 1998),

citing *In re Johnson*, 756 F.2d 738, 740 (9th Cir.), *cert. denied*, 474 U.S. 828, 106 S.Ct. 88, 88

L.Ed.2d 72 (1985) ("Hearings on relief from the automatic stay are thus handled in a summary

fashion.  The validity of the claim or contract underlying the claim is not litigated during the

hearing.").

　　　An action to determine the validity, extent or priority of a lien or other interest in property

requires an adversary proceeding under F.R.B.P. 7001(2).  *Grella v. Salem Five Cent Sav. Bank*,

42 F.3d 26, 33 (1st Cir. 1994), adopting *Matter of Vitreous Steel Prods. Co.*, 911 F.2d 1223 (7th

Cir. 1990).  Because of the outstanding disputes regarding the terms of the note and security

agreement, this Court cannot make a determination of the amount of interest or late fees allowed

on Intervest's claim in this summary proceeding.  Nor would such a determination be appropriate

under *Luz,* 219 B.R. at 842.  Based on the same authority, this Court cannot in this summary

proceeding make a determination that the Debtor is not the owner of the Collateral.  The quitclaim

deed to Series 39 shown at Ex. 7 is enough for the Debtor to have a colorable claim in this

summary proceeding.

　　　What remains to determine Debtor's equity in the Collateral are the amounts shown by the

evidence.  The value of the Collateral is $8,182,125.  The stipulated amount of Intervest's

principal is $6,360,786.44.  Ex. 9 shows a total of $162,368.35 in real property taxes secured by

the Collateral.  The total of the secured debt shown by the evidence is $6,523,154.79, leaving an

equity for the Debtor in the amount of $1,658,970.21.  The Court concludes that Intervest failed

its burden to show that the Debtor does not have an equity in the Collateral under § 362(d)(2)(A).

　　　If Intervest had satisfied its burden of proof under § 362(d)(2)(A), the Debtor would have

had the burden of proof under § 362(d)(2)(B) of showing that the property is necessary to its effective reorganization.  The Court finds that Debtor has satisfied the burden under § 362(d)(2)(B).  Prior to the July 27, 2011, hearing the Debtor moved for the Court to take judicial notice of the Debtor's Disclosure Statement and Plan.  Dkt. 70.  The Court granted Debtor's motion by Order entered on July 25, 2011.

Debtor's Disclosure Statement (Dkt. 68) identifies the Mullan Heights Condo project as its property at pages 12-13.  It explains that this Chapter 11 case is not an attempt to shelter Canyon Holdings from its creditors, including Intervest, but rather to restructure debt and maximize the Mullan Heights Condos and to sell the remaining 43 units under a confirmed Plan over a term of two years.  Dkt. 68, pp. 15, 23, 24-26.  Debtor's Chapter 11 Plan (Dkt. 67) describes at section 4.08 on pages 10-12 the means of reorganization and payment of secured claims from the sale of the 43 units, "in whole" or by individual units over a 2-year term.

Intervest did not contest that the property is necessary to Debtor's effective reorganization, except that Intervest argues that the Court should not consider the issue of feasibility based on the existence of the "new debtor syndrome."  Because the Debtor's evidence in the Plan and Disclosure Statement, of which the Court took judicial notice, is uncontroverted, the Court finds and concludes that the Debtor satisfied its burden under § 362(d)(2)(B) of proving that the Collateral is necessary to the Debtor's effective reorganization.  Without the Collateral the Debtor has no chance at reorganization.

### § 362(d)(1) – Cause.

With respect to Intervest's motion based on § 362(d)(1) for "cause," as the party seeking relief Intervest must first establish that cause exists for relief under § 362(d)(1).  *United States of*

22

*America v. Gould (In re Gould)*, 401 B.R. 415, 426 (9ᵗʰ Cir. BAP 2009), citing *Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 206 B.R. 196, 200 (9ᵗʰ Cir. BAP 1996).  Once a prima facie case has been established, the burden shifts to the debtor to show that relief from the stay is not warranted.  *Id.*

Intervest's Motion alleges that the Debtor filed the petition in bad faith and invokes the "new debtor syndrome" as "cause" for relief under § 362(d)(1).  Hursh argued at the hearing that if Intervest satisfies its burden of establishing the elements of new debtor syndrome then the Court should not consider whether the property is necessary to an effective reorganization.  That argument is not in line with controlling Ninth Circuit authority.

In *Duvar* the Ninth Circuit wrote:

> The term "new debtor syndrome" identifies a pattern of conduct which exemplifies bad faith cases. [*In re Laguna Assoc. Ltd. Partnership,* 30 F.3d 734, 738 (6ᵗʰ Cir. 1994)] (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5ᵗʰ Cir. 1986)).  Indicia of the new debtor syndrome include:  (1) transfer of distressed property into a newly created corporation; (2) transfer occurring within a close proximity to the bankruptcy filing; (3) transfer for no consideration; (4) the debtor has no assets other than the recently transferred property; (5) the debtor has no or minimal unsecured debt; (6) the debtor has no employees and no ongoing business; and (7) the debtor has no means, other than the transferred property, to service the debt on the property.  *In re Yukon Enter., Inc.*, 39 B.R. 919, 921 (Bankr. C.D. Cal. 1984).
>
> A creditor can establish a prima facie case of bad faith filing by showing the transfer of distressed property to the debtor within close proximity to the bankruptcy filing.  *Id.*  Once a prima facie case is established, the burden shifts to the debtor to demonstrate a good faith business reason for the transfer and the filing.  *In re Eighty South Lake, Inc.*, 63 B.R. 501, 508 (Bankr. C.D. Cal. 1986), *aff'd*, 81 B.R. 580 (9ᵗʰ Cir. BAP 1987).

*Duvar*, 205 B.R. at 200.

This Court's test for bad faith dismissal under 11 U.S.C. § 1112(b) under both objective

and subjective tests, examining a totality of the circumstances, is set forth at *In re Detienne Associates Ltd. Partnership*, 342 B.R. 318, 323-24 (Bankr. D. Mont. 2006), and cites cases cited in *Duvar* such as *Little Creek* and *In re Arnold,* 806 F.2d 937 (9th Cir. 1986).

The evidence shows that several of the *Yukon* factors are present.  Series 39 is not a newly established corporation.  It is a "Series" which apparently is authorized under Delaware law and was established in 2005.  Ex. K.  The quitclaim deed to Series 39 was executed on the date of the filing of the Chapter 11 petition.  The evidence does not show consideration, as Stebner was conveying property from one of the entities he controlled to another.  The Debtor has no other assets.  The unsecured debt is unliquidated.  With respect to indicia (6), no showing exists that the Debtor has employees, but it does have an ongoing business operating the Mullan Heights Condos after the transfer, collecting rents and attempting to reorganize.  The Debtor has no means other than the Collateral to service the debt.

Based on those indicia, the Court finds that Intervest established a prima facie case of bad faith filing based on the new debtor syndrome.  However, under controlling authority that is not, as Intervest argues, the end of the analysis.  *Duvar* shifts the burden to the Debtor to demonstrate a good faith business reason for the transfer and the filing.  205 B.R. at 200, citing *Eighty South Lake*, 63 B.R. at 508.

The Debtor argues that Canyon Holdings transferred the Collateral to Series 39 in order to reorganize and sell the 43 units in a Chapter 11 Plan, over the resistance and refusal by Intervest to permit the completion of sales.  Debtor argues that the Collateral is located in Missoula, and that the transfer was made in order to file a reorganization case for the Collateral alone rather than a complex Chapter 11 case involving multiple entities and properties, either in Delaware or

24

Washington.

In *Duvar* the Ninth Circuit repeated its reasoning from *Arnold*, 806 F.2d at 939:

> [T]he court stated that if it is obvious that the debtor is attempting to deter and harass creditors, good faith does not exist.  *Arnold*, 806 F.2d at 939.  The court then stated that if it is apparent that the purpose is not to delay or defeat creditors, but rather to attempt a speedy and efficient reorganization, good faith cannot be denied.  *Id.* (citing *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. BAP 1983).

*Duvar*, 205 B.R. at 201.

Based on the testimony and exhibits admitted at hearing, this Court does not find it obvious that the Debtor in the instant case is attempting to deter and harass Intervest, or other creditors.  Canyon Holdings consistently attempted to successfully market the Collateral, and actively leased vacant condos to generate funds in a manner which the Washington Superior Court found was permitted by the assignment, Ex. 3.  Canyon Holdings paid Intervest 5% of the outstanding balance within the period to extend the maturity date, as provided in the note, Ex. 2. Canyon Holdings actively marketed the 43 units, successfully sold one and obtained signed offers to sell three more, but Intervest refused to release them for sale.

The Debtor does not dispute that it filed Chapter 11 to reorganize its debt to Intervest, and to sell the 43 units over Intervest's opposition and effective veto of sales.  Debtor hopes to modify Intervest's rights under the note and security agreement in its Plan.  "[T]hat a creditor's contractual rights are adversely affected does not by itself warrant a bad faith finding."  *Platinum Capital, Inc. v. Sylmar Plaza, L.P., (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1075 (9th Cir. 2002).  The Debtor has filed a Chapter 11 Plan and Disclosure Statement in a timely fashion, and the Disclosure Statement is set for hearing in September.  "In enacting the Bankruptcy Code,

25

Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy rights." *Platinum Capital,* 314 F.3d at 1075.

Based on the evidence, the Court finds that the Debtor's filing is an attempt at a speedy and effective reorganization, not to deter and harass creditors, and that the Debtor has satisfied its burden to demonstrate a good faith business reason for the transfer and the filing. *Duvar*, 205 B.R. at 200-01 (citing cases). Therefore, this Court exercises its discretion and denies Intervest's motion to modify stay. *Mataya v. Kissinger*, 72 F.3d at 108-109. The Court finds that the Debtor has satisfied its burden to show that relief from the stay should not be granted for "cause" under § 362(d)(1).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a).

2. Intervest's Motion to Modify Stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

3. Intervest failed to satisfy its burden of proof under 11 U.S.C. § 362(d)(2)(A) and § 362(g)(1) to show that the Debtor does not have an equity in Intervest's Collateral.

4. Debtor satisfied its burden of proof under § 362(d)(1) and § 362(g)(2) to show that relief from the automatic stay should not be granted.

5. Debtor satisfied its burden to demonstrate a good faith business reason for the transfer of the Collateral and its Chapter 11 filing. *In re Duvar Apt., Inc.*, 205 B.R. 196, 200, 201 (9th Cir. BAP 1996). It is apparent that the Debtor's purpose was not to delay or defeat creditors, but rather to attempt a speedy and efficient reorganization. *In re Arnold*, 806 B.R. 937, 939 (9th Cir. 1986) (citing *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. BAP 1983)).

26

**IT IS ORDERED** a separate Order shall be entered in conformity with the above, denying

Intervest's Motion to Modify Stay.

BY THE COURT

_Ralph B Kirscher_

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

27